UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MADDIE RHEA ANGUIANO,<br><br>Defendant. | No. 5:25-CR-175-02-H |

**MEMORANDUM ORDER AND OPINION**

Before the Court is Maddie Anguiano's (Anguiano) Motion to Sever (Dkt. No. 55). Anguiano's joint criminal trial is set for November 2, 2026, in which she and her husband and codefendant Marcus Anguiano (Marcus), are charged with the production, receipt, and distribution of child pornography. *See* Dkt. No. 3. Anguiano moves to sever her trial from her husband's, arguing in large part that exposing Anguiano to the same jury as Marcus will cause her prejudice that a limiting instruction cannot remediate. Dkt. No. 55. After reviewing the pleadings and applicable law and hearing the arguments of counsel, the Court denies the Motion.

## I. Factual Allegations and Procedural Background[1]

The government alleges the following facts. In August 2016, while on military leave from Mountain Home Air Force Base in Idaho, Airman First Class Marcus Anguiano traveled to Wolfforth to stay with family. At some point during that trip, he was tasked with babysitting his 8-year-old female cousin, Jane Doe-1. While babysitting, Marcus placed Jane Doe-1 on his lap and repetitively moved her up and down against his genitals,

[1] Unless indicated otherwise, all alleged facts are drawn from the background section (Section II.A) of the government's response to Anguiano's Motion to Sever. *See* Dkt. No. 62 at 2–13.

which he told her was a form of "working out." Two years later, again while staying with his family in the Lubbock area, Marcus was once again alone with Jane Doe-1. This time, while the child was laying on a bed, Marcus lifted the leg of her shorts and took photos of her genitals with his cell phone—even after she insisted it made her uncomfortable. The following January, Jane Doe-1 reported Marcus's behavior to her parents, who contacted authorities. During a forensic interview, Jane Doe-1 reiterated the claims about Marcus she made to her parents. Later in the investigation, investigators also discovered allegations that Marcus had sexually abused two other young cousins when he was younger.

By the summer of 2019, the allegations against Marcus had reached the United States Air Force. On July 25, 2019, the Air Force Office of Special Investigations (AFOSI) launched an investigation into Marcus. On or about August 13, AFOSI investigations obtained and executed a search warrant on Marcus's cell phone. The subsequent forensic examination of the phone revealed at least 240 images of minor children—172 of which were of the same female child being bathed. Of that subset of images, many showed the child's exposed genitals. The forensic examination also uncovered various voyeuristic pictures and screenshots of advertisements for spy cameras, as well as a host of Internet searches for hidden visual recording devices, information concerning Internet browsers that do not track user activity, and both child and adult pornography. More than that, the examination revealed text exchanges between Marcus and his wife, Anguiano, in which the pair discussed surreptitiously recording and photographing adult females, and in which Marcus directed Anguiano to do so in the women's locker room at the Air Force base gym.

One particular text exchange stood apart from the rest. On or about June 30, 2018, the couple discussed Anguiano giving an unidentified individual a bath. Further

investigation into the photos of the child being bathed (Jane Doe-2) revealed the presence of an adult female who was washing the child and appeared to be Anguiano. In later interviews, the parents of Jane Doe-2 (relatives of Anguiano) indeed identified Anguiano, and they explained that Anguiano had babysat Jane Doe-2 on numerous occasions throughout 2019. The parents also identified Jane Doe-2 as the child in the tub and in another subset of photos on Marcus's phone. These other images were of Jane Doe-2 lying on a bed with her genital area covered by underwear, although many featured close-ups of the child's covered genitals. During a forensic interview, Jane Doe-2 later revealed that Anguiano had on at least one occasion suggested a "game" the two could play—which involved compelling the child to perform sexual acts on Anguiano.

In December 2025, a grand jury indicted Marcus and Anguiano in a four-count indictment. Dkt. No. 3. Marcus faces four charges; Anguiano faces three. They are jointly charged with Conspiracy to Produce and Attempt to Produce Child Pornography in violation of 18 U.S.C. § 2251(e); Production and Attempted Production of Child Pornography in violation of 18 U.S.C. § 2251(a); and Receipt and Distribution of Child Pornography in violation of 18 U.S.C. §§ 2252A(a)(2) and (b). These counts concern Jane Doe-2. Marcus's additional charge is a further alleged instance of Production and Attempted Production of Child Pornography (18 U.S.C. § 2251(a)), which concerns Jane Doe-1. *See id.*

Anguiano pled not guilty to the counts against her. Dkt. No. 27. The Court granted the parties' joint motion for continuance of trial, declared this case complex, and reset the trial to November 2, 2026. Dkt. No. 53. On August 6, Anguiano filed the present motion.

Dkt. No. 55. The government responded, Dkt. No. 62, and Anguiano replied. Dkt. No. 65. On September 29, the Court held a hearing on the motion, and the motion is ripe for review.

## II. Legal Standard

Federal Rule of Criminal Procedure 8(b) provides that an indictment may charge multiple defendants if those defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." But "[a]ll defendants need not be charged in each count," Fed. R. Crim. P. 8(b), and Rule 8(b) "does not require . . . that each defendant have participated in the same act or acts." *United States v. Krenning*, 93 F.3d 1257, 1266 (5th Cir. 1996). Instead, the proper joinder of defendants only requires "a series of acts unified by some substantial identity of facts or participants." *United States v. McRae*, 702 F.3d 806, 820 (5th Cir. 2012).

Where joinder is proper, but nonetheless "appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide another other relief that justice requires." Fed. R. Crim. P. 14(a). But where defendants have been properly joined, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

The Fifth Circuit has adopted anything but a "liberal attitude toward severance," *McRae*, 702 F.3d at 822," and "[j]oinder is the rule rather than the exception." *United States v. Mikolajczyk*, 137 F.3d 237, 240 (5th Cir. 1998). Therefore, overcoming the favorable presumption of joinder is a difficult task. It requires showing that, absent severance, the defendant will face "specific compelling prejudice." *United States v. Lewis*, 476 F.3d 369, 383

(5th Cir. 2007). More specifically, she must show that "(1) the joint trial [will] prejudice[] [her] to such an extent that the district court [cannot] provide adequate protection; and (2) the prejudice outweigh[s] the government's interest in economy of judicial administration." *United States v. Ledezma-Cepeda*, 894 F.3d 686, 690 (5th Cir. 2018).

Accordingly, "[g]eneric allegations of prejudice will not suffice." *Id.* In other words, a "defendant is not entitled to severance just because it would increase [her] chance of acquittal or because evidence is introduced that is admissible against certain defendants." *Burton v. United States*, 237 F.3d 490, 495 (5th Cir. 2000) (citing *Zafiro*, 506 U.S. at 540). Nor is a defendant entitled to severance simply because a single jury may hear the entirety of evidence presented—some of which may be relevant to the defendant and some which may not. *United States v. Bieganowski*, 313 F.3d 264, 287 (5th Cir. 2002) ("A spillover effect, by itself, is an insufficient predicate for a motion to sever."). Moreover, "[c]ompelling prejudice is not shown if it appears that, through use of cautionary instructions, the jury could reasonably separate the evidence and render impartial verdicts as to each defendant." *United States v. Erwin*, 793 F.2d 656, 665 (5th Cir. 1986). "[S]everance is required on the basis of a disparity in the evidence only in the most *extreme* cases." *United States v. Rocha*, 916 F.2d 219, 229 (5th Cir. 1990) (emphasis in original).

The Court has wide discretion to deny a motion to sever. *United States v. Reed*, 908 F.3d 102, 114 (5th Cir. 2018). This is born from the balance the Court must strike between "the potential prejudice to the defendant" and "the public interest in joint trials." *United States v. Oliver*, No. 3:07-CR-380, 2008 WL 2511751, at *1 (N.D. Tex. June 23, 2008) (Fitzwater, J.). But there is certainly "a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro*, 506 U.S. at 537. This preference is rooted in

the tenet that "[j]oint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability . . . ." *Richardson v. Marsh*, 481 U.S. 200, 210 (1987). And "[t]he rule that persons indicted together should be tried together carries great weight where . . . persons are charged with committing the same conspiracy." *Mikolajczyk*, 137 F.3d at 240.

More often than not, "less drastic measures [than severance], such as limiting instructions, . . . will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539. "Ordinarily, traditional safeguards will remedy the risk of prejudice from joinder . . . [,] includ[ing]: (i) clear rulings on admissibility, (ii) limitations of the bearing of evidence as against particular individuals, and (iii) adequate instructions." *United States v. Potashnik*, No. 3:07-CR-289, 2008 WL 5272807, at *7–8 (N.D. Tex. Dec. 17, 2008). These approaches are favored over severance "because it is generally presumed that juries follow the instructions given to them by the district court and are capable of compartmentalizing the evidence against each defendant." *Ledezma-Cepeda*, 894 F.3d at 690 (cleaned up) (first citing *United States v. Chapman*, 851 F.3d 363, 380 (5th Cir. 2017); and then citing *United States v. Tarango*, 396 F.3d 666, 677 (5th Cir. 2005)); *see also Richardson*, 481 U.S. at 211 ("[J]uries are presumed to follow their instructions.").

## III. Analysis

Anguiano makes a variety of arguments in support of severance, including: (1) a joint trial means that a jury will hear "a large body of inflammatory evidence that is admissible only against [Marcus] Anguiano," (2) a joint trial will "expose" the jury to a separate criminal investigation against Marcus with "extraordinarily prejudicial" specifics that pertain only to Marcus, (3) the jury cannot "realistically" compartmentalize this case, and

(4) the government's interest in a single trial is "minimal." Dkt. No. 55 at 5–10. Each fails against the bulwark of the favorable presumption of joinder.

**A. Anguiano's spillover arguments are unavailing.**

In large part, Anguiano expresses concern about a variety of potential evidence that she contends is admissible solely against Marcus—namely, the investigative details surrounding Marcus's sexual abuse of Jane Doe-1, allegations of Marcus's sexual abuse of other child family members, his Internet searches, and his research into hidden cameras. *Id.* at 5. The problem, as she sees it, is "[e]ach item [of evidence] invites the jury to convict Mrs. Anguiano by association with a man portrayed as a serial predator." *Id.* And on what is ultimately little more than conjecture, Anguiano opines that "no instruction will keep that horror from bleeding into [the jury's] evaluation of whether [Anguiano] took bath photographs of a different child with the specific criminal purpose [18 U.S.C. § 2251(a)] requires." *Id.* at 6. But this conclusion is not supportable—even despite a number of Fifth Circuit cases that Anguiano insists weave the following "common thread": "when the co-defendant's evidence is both inadmissible against the movant and emotionally overwhelming, the jury cannot realistically compartmentalize." *Id.*

First, Anguiano places far too little faith in the jury, but even so, the caselaw she cites does not stand for her suggested proposition. For example, in *United States v. Erwin*, 793 F.2d 656, 665–66 (5th Cir. 1986), the court examined a denial-of-severance challenge after a multi-defendant trial in which various defendants were charged with conspiracy, racketeering, tax evasion, possession and distribution of drugs, and a host of other offenses. In that case, the appellants argued that evidence of their criminal organization's "two kidnappings, two beatings[,] and one killing . . . which differed qualitatively from the crimes

with which the appellants were actually charged . . . poisoned the jury's minds against all of the appellants." *Id.* at 665. The Fifth Circuit generally disagreed. While the court noted that "evidence of the most egregious crimes, to some extent unnecessarily cumulative, did take up a large part of the trial," it also observed how the district court "frequently cautioned the jury—before, during[,] and after the trial—about the proper use of the evidence." *Id.* at 666. And it found that the jury's questions during its deliberations "demonstrate[d] the care it gave to sorting" through the complex case. *Id.*

As to all but one of the appellants, the court did not find prejudice from the joinder. The lone exception was an appellant whose perjury charges "were already only peripherally related to those alleged against the other appellants" and against whom "it became increasingly apparent" as the trial progressed that "very little of the mountainous evidence was usable." *Id.* at 665–66. For that appellant, and only her, the "prejudice she suffered from the joint trial . . . far outweighed any benefit of judicial economy." *Id.*

Anguiano's case is readily distinguishable from the successful *Erwin* appellant's. Here, to the extent Anguiano characterizes her charges as "peripherally related" to Marcus's, she is mistaken. Dkt. No. 55 at 6. The four-count indictment jointly charges Anguiano and Marcus with three of those four counts, and as a result, a sizable quantity of evidence in this case will necessarily pertain to both defendants. *See* Dkt. No. 3. They are jointly charged with conspiracy to produce and attempt to produce child pornography, production and attempted production of child pornography, and receipt and distribution of child pornography stemming from the same factual circumstance—the bathtime pictures of Jane Doe-2. *See id.*; Dkt. No. 62 at 4–7.

So, whatever disparity in evidence does exist between the government's case against Anguiano and its case against her husband, that differential is simply not of *Erwin*'s caliber. Unlike the appellant in *Erwin*, Anguiano is not charged with a peripheral offense like perjury, and she is not alleged to have scarcely affected a broader conspiracy. Rather, according to the indictment, her conduct was instrumental to the conspiracy alleged in this case. *See* Dkt. No. 3.

Anguiano next cites *United States v. Cortinas*, 142 F.3d 242, 248 (5th Cir. 1998); *McRae*, 702 F.3d at 821–25; and *Tarango*, 396 F.3d at 674–77, for further support of her position that "inflammatory" evidence against Marcus will prejudice her. Dkt. No. 55 at 6. But, again, each case is distinguishable. In *Cortinas*, the Fifth Circuit found that two conspirators were prejudiced by testimony about the tactics and activities of a criminal gang whose members were also charged as members of the conspiracy, and by "highly inflammatory evidence" of a shooting the gang perpetrated. 142 F.3d at 248. But that was because the prejudiced conspirators were not associated with the gang. *Id.* Anguiano's circumstances are very different. Unlike the prejudiced conspirators in *Cortinas*, Anguiano's alleged criminal conduct is well associated with her codefendant's own. Indeed, much of the conduct alleged against Marcus in this case is conduct Anguiano was allegedly part of herself.

While the Court has no problem agreeing with Anguiano that "[c]hild sexual-abuse evidence is at the far end of the inflammatory spectrum," Dkt. No. 55 at 6, the allegations of sexual abuse against Marcus alone are few and both distinct and temporally removed from the alleged sexual abuse that Anguiano perpetrated. Even though these defendants are well

associated with one another, a jury will have no trouble recognizing who is responsible for what and whether each individual defendant is criminally liable as charged.

Next, in *McRae*, an appellant successfully challenged the district court's denial of his motion for severance where that defendant "was charged only with depriving a victim . . . of his right to be free from the use of unreasonable force by a law enforcement officer, and carrying, using, and discharging a firearm in furtherance of a felony crime of violence resulting in death." *United States v. Hill*, 63 F.4th 335, 353 (5th Cir. 2023) (summarizing *McRae*, 702 F.3d at 824). In contrast, his codefendants were charged with "beating two men, burning one of their cars, and burning [a victim's] body," as well as obstruction of justice, the use of fire to commit civil rights deprivations, and other crimes. *Id.* In concluding that the *McRae* appellant suffered prejudice, the Fifth Circuit noted that if he "had been tried alone, the trial would have lasted approximately three days"—but he was instead "subjected to sit before the jury for a trial lasting a month, in which sordid evidence and testimony was introduced" about conduct in which he did not take part. *Id.*; *McRae*, 702 F.3d at 825–26.

Importantly, the Fifth Circuit has "indicated that the *McRae* decision was narrow and based on the facts presented in that case." *Hill*, 63 F.4th at 353–54. Indeed, as the Court explained in *Reed* when rejecting a denial-of-severance challenge, "the charge and evidence against [the *Reed* defendant] was significantly related to the charge and evidence against [the *Reed* co-defendant] . . . , whereas in *McRae*, two sets of defendants were effectively being tried for two completely different offenses." 908 F.3d at 114 n.40. Anguiano's circumstances are similar to the *Reed* appellants'. Anguiano's and Marcus's charges are near-identical, and a significant amount of evidence will naturally concern them both.

Further, unlike in *McRae*, there is no indication here that a joint trial will be prejudicially longer than separate trials—or in any event, certainly no indication strong enough to overcome the government's interest in judicial efficiency by trying both defendants together. More importantly, however, unlike the successful appellant in *McRae*, Anguiano is not alleged to have "committed crimes qualitatively less severe than those of [her] codefendant[]." *Hill*, 63 F.4th at 354. Whatever inflammation is incidental to allegations of the sexual abuse of children, the evidence of Marcus's conduct is unlikely to be "so *much more* inflammatory than the conduct for which [Anguiano] was charged that [the] 'jury would find it highly difficult to disassociate it from'" Anguiano's own conduct. *Id.* (emphasis added) (quoting *Reed*, 908 F.3d at 114 n.40). Both defendants were charged with sex crimes, and Anguiano's alleged role in this case is quite similar to Marcus's own.

Next, *Tarango* presented "exceptional circumstances" not found here. 396 F.3d at 674. In that case, where the appellant's codefendant absconded before the trial began, a "disproportionate number" of the nearly 50 witnesses "testified as to [the] missing co-defendant," leading to "scant testimony that [the appellant] did anything improper," and resulting in a "significant amount of inadmissible evidence (as it pertained to [the appellant])." *Id.* at 670, 675. When combining these factors with "the degree of notoriety attending to [the codefendant's] absence," the Fifth Circuit found that a new trial was the proper remedy for what should have been a severance. *Id.* These circumstances are inapplicable to Anguiano's case.

Lastly, Anguiano attempts to distinguish two cases where the Fifth Circuit found that joinder was not prejudicial: *United States v. Perry*, 35 F.4th 293 (5th Cir. 2022), and *United States v. Shows Urquidi*, 71 F.4th 357 (5th Cir. 2023). Dkt. No. 55 at 6. In Anguiano's

telling, the *Perry* appellants were "convicted of the same conspiracies as their co-defendants on largely common proof." *Id.* But this description resembles Anguiano's own case, and to the extent she believes otherwise, she is mistaken. Anguiano is charged with the same conspiracy as Marcus, and their cases will involve largely common proof—at least as to three of the four charges.

And as to the evidence that pertains solely to Marcus (specifically, his alleged abuse of Jane Doe-1), Anguiano's concern about the effect that evidence will have on the jury is a concern that *Perry* affords little weight absent a more specific showing of prejudice. "Merely alleging a 'spillover effect'—whereby the jury imputes the defendant's guilt based on evidence presented against [her] co-defendant[]—'is an insufficient predicate for a motion to sever.' Nor is it sufficient for a defendant to allege [that] [she] w[as] less involved than [the] other defendant[]." *Perry*, 35 F.4th at 343 (citation omitted).

*Shows Urquidi* also cuts against Anguiano's position. In that case, where "most of the evidence adduced at trial was exclusively targeted at the counts that were only faced by [the appellant's codefendant]," the Fifth Circuit found severance unnecessary, and it held that the district court's instruction that the jury consider each defendant's case "separately and independently" was sufficient to avoid prejudice. *Shows Urquidi*, 71 F.4th at 379. Importantly, this was even though the evidence in question was "particularly 'graphic, emotional, gruesome, and gut-wrenching.'" *Id.* The evidence against Marcus undoubtedly inspires similar adjectives, but absent a more specified showing of prejudice, this alone does not demonstrate a need to sever the defendants' trials.

In a final effort to bolster her argument with caselaw, Anguiano insists that neither *Perry* nor *Shows Urquidi* "involved . . . a stand-alone count naming a different victim[] and

propensity-type evidence admissible against her co-defendant alone." Dkt. No. 55 at 6. But this argument misses the throughline of the precedent on this topic: Juries are presumed capable of compartmentalizing the evidence against each defendant. *Ledezma-Cepeda*, 894 F.3d at 690. And the Court has no reason to suspect a jury would be incapable of doing the same here. In any event, Anguiano offers no authority for the proposition that propensity evidence as to one defendant will per se prejudice the other and thus justify severance.

Anguiano's remaining arguments for severance fare no better. For one, she insists that once the jury hears evidence of the multi-year AFOSI investigation into Marcus—which includes evidence of Marcus's threatening conduct towards others—it "will not thereafter assess his wife's intent with a clean slate." Dkt. No. 55 at 7–8. This is plainly a simple spillover argument, and it is unavailing. "[S]everance is required on the basis of a disparity in the evidence only in the most *extreme* cases." *Rocha*, 916 F.2d at 229 (emphasis in original). This case is not one. Marcus clearly has a troubled past, but Anguiano presents no cognizable reason why "through the use of cautionary instructions, the jury could [not] reasonably separate the evidence" of that past between Marcus to whom it applies and Anguiano to whom it does not—"and render impartial verdicts as to each defendant." *Erwin*, 793 F.2d at 665.

### B. Anguiano provides no reason to believe the jury is incapable of compartmentalization.

Next, Anguiano expresses a concern that because she and Marcus are a married couple charged with conspiracy, the jury, once instructed "that it may impute one spouse's acts to the other for some purposes[,] cannot realistically be expected to wall off [Marcus's] separate-victim conduct, threats, search history, and uncharged acts for other purposes." *Id.* at 9. Anguiano again places too little faith in the jury and does not offer authority for her

doubt. Besides that, however, the Fifth Circuit has "held numerous times that the relationship between co-defendants does not" create reversible prejudice. *United States v. Owens*, 683 F.3d 93, 99 (5th Cir. 2012) (collecting cases); *see also United States v. Solis*, 299 F.3d 420, 441 (5th Cir. 2002) (rejecting appellant's argument that "he was convicted on guilt by association" because he was tried with his brother).

Further on this topic, Anguiano devotes great space in her reply to her fear that the government will use "[Marcus's] search history, [Marcus's] voyeurism, and [Marcus's] 'particular sexual interest'" to establish *her* mental state in a manner that no instruction can cure. Dkt. No. 65 at 3–4. This concern appears to misunderstand the government's argument. In its response to Anguiano's motion, the government explains that it "intends to offer evidence of the defendants conspiring to and communicating about surreptitiously recording adult women in various stages of undress to prove various non-propensity purposes." Dkt. No. 62 at 15.

And while the response mentions that Marcus "has a particular sexual interest in non-consensual recording of nude girls and women," the government indicates how that Marcus-specific evidence is relevant to and tends to prove Anguiano's state of mind: "[O]n other occasions, forensic evidence revealed that Marcus communicated with Anguiano instructing her to film her adult friends nude and in various states of undress for his own sexual gratification. . . . This all proves Marcus and Anguiano's collective intent, preparation, plan, and motive." *Id.* The Court disagrees with Anguiano's construction of the government's response as simply "reason[ing] from one spouse's character to the other's intent." Dkt. No. 65 at 4. Rather, the government's theory is that Anguiano's intent can be

informed at least in part by Marcus's sexual interests because the couple allegedly communicated about those interests and worked in concert to gratify them.[2]

**C. An antagonistic defense here does not require severance.**

Next, as Anguiano correctly indicates, her desire to present a defense antagonistic to Marcus's does not require severance. Dkt. No. 55 at 9 (citing *Zafiro*, 506 U.S. at 538). But she insists her antagonism "compounds the spillover" to such an extent that severance is required. *Id.* Yet it is hard to understand how a defense "focus[ed] on the absence of any independent criminal purpose"—even if it somehow "devolves into finger-pointing between spouses before a single jury," *id.*—is "antagonistic to the point of being mutually exclusive." *United States v. Berkowitz*, 662 F.2d 1127, 1133 (5th Cir. Unit B Dec. 1981). "[T]he defense of a defendant reaches a level of antagonism (with respect to the defense of a co-defendant) that compels severance of that defendant[] if the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony

[2] Anguiano also raises concerns that evidence of Marcus's past sexual abuse of other minors will not just be passively imbued to her by the jury—but actively imbued to her in violation of the Federal Rules of Evidence. Dkt. No. 65 at 2–3. She cites the government's argument that Federal Rule of Evidence 414 "authoriz[es]" admitting "the individual sexual abuse of a child by one defendant . . . to prove the joint actions of both defendants" since "the defendants are charged as conspiring to produce child pornography together." Dkt. No. 62 at 14–15. Rule 414 provides that "[i]n a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation. The evidence may be considered on any matter to which it is relevant." Fed. R. Evid. 414(a); *see also id.* 414(d) (defining "child molestation" to include the Anguianos' charged offense). While the government does not offer authority for the proposition that evidence of Marcus's pre-conspiracy child molestation is admissible against Anguiano simply because she is his alleged coconspirator, *see* Dkt. No. 62 at 15, to the extent Anguiano's argument accurately reflects the government's intentions with this evidence, the Court can take up this issue in a motion in limine, at the pre-trial conference, and/or with proper limiting instructions. Anguiano's argument in this vein does not present a reason for severance.

offered on behalf of his co-defendant." *Id.* at 1134. In other words, the Court asks: Does one defendant's defense require the jury to find the other guilty? *Id.*

Here, the answer is no. In order to find Marcus not guilty of production, attempted production, receipt, or distribution of child pornography (as to Jane Doe-2's bathtime photos), the jury need not find Anguiano guilty of those offenses. If, for example, the jury finds that Marcus lacked the "intent that [Jane Doe-2] engage in[] any sexually explicit conduct for the purpose of producing any visual depiction of such conduct," 18 U.S.C. § 2251(a), this does not mean that the jury must consequentially find that Anguiano possessed that intent. Each defendant could craft a defense that he or she lacked the requisite intent—that, for example, each was misguidedly but innocuously sharing photos of a child relative's bathtime. In such a way, neither defendant's intent hinges on the other's, and there is no antagonism so prejudicial to require severance. The same is true of the offense in 18 U.S.C. §§ 2252A(a)(2), (b). Whether one of the defendants "knowingly" received or distributed what was legally classifiable as child pornography does not turn on whether the other knew that the photos of Jane Doe-2 were so classifiable.

Furthermore, as Anguiano correctly recalls, Marcus has not made a confession implicating her—which *could* conceivably reduce their respective cases to mutual exclusivity. Dkt. No. 55 at 8; *see Oliver*, 2008 WL 2511751, at *1 (denying a defendant's motion to sever at least in part because of no implicating confessions from a codefendant).

Anguiano also suggests that severance is required since her planned defense will be "in direct tension with the government's portrait of [Marcus]." Dkt. No. 55 at 9. It is not immediately clear what she means by this. While creating tension with the prosecution's

characterization of a codefendant might cause the government concern, surely it need not concern the defense. It is difficult to understand how this tension would be prejudicial.

### D. The interest in efficiency promoted by a single trial is well established.

Finally, Anguiano argues that the government has only a "minimal" interest in a single trial. *Id.* at 10. The Court disagrees. The rationale for a single trial is well established. "Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability . . . ." *Richardson*, 481 U.S. at 210; *see also Mikolajczyk*, 137 F.3d at 240. In this case, the extra time required to try both defendants together is minimal. *Cf. McRae*, 702 F.3d at 825–26. And the assertion that a jury cannot compartmentalize even a "voluminous and . . . complex" record over a multiday period is belied by caselaw noting just the opposite. Dkt. No. 55 at 10; *see, e.g.*, *Erwin*, 793 F.2d at 665–66.

## IV. Conclusion

In sum, Anguiano's severance arguments stem largely from her fear that the jury will confuse the issues and be "impeded [in] [its] ability to parse out [her] guilt." *Chapman*, 851 F.3d at 380. But though many criminal defendants complain about a "generalized spillover effect," their inability to point to "any specific prejudice resulting from [a] combined trial" is insufficient to overcome the favorable presumption of joinder. *United States v. Stalnaker*, 571 F.3d 428, 435 (5th Cir. 2009) (citation modified). Such is the case here. For the reasons detailed above, the Court finds that Anguiano has failed to demonstrate "specific

compelling prejudice," *Lewis*, 476 F.3d at 383, and her Motion to Sever (Dkt. No. 55) is denied.[3]

Maddie and Marcus Anguiano's trial will continue to proceed jointly, and it remains set for November 2, 2026, at 9:00 a.m.

So ordered on October 16, 2026.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE

[3] As "alternative relief" and because "discovery is voluminous," Anguiano asks the Court to "order the government to identify pretrial every statement of [Marcus] it intends to offer at trial, together with any proposed redactions, so that any *Bruton* or *Gray* issue may be adjudicated before a jury is sworn." Dkt. No. 55 at 8; *Gray v. Maryland*, 523 U.S. 185, 192 (1998) ("[C]ertain 'powerfully incriminating extrajudicial statements of a codefendant'—those naming another defendant—considered as a class, are so prejudicial that limiting instructions cannot work." (citing *Bruton v. United States*, 391 U.S. 123, 135 (1968)). The Court declines this request. First, Anguiano acknowledges that "Mr. Anguiano . . . made no statement implicating Mrs. Anguiano" in his interview with AFOSI investigators. Dkt. No. 55 at 8. So she seems to merely speculate that "additional statements [implicating her] may exist." *Id.* But, second, even if they do exist, Anguiano does not explain why the Court should order the Government to do defense counsel's job for it. Discovery may be "voluminous" in this case, *id.*, but it is not the Government's obligation to provide *inculpatory* evidence to Anguiano. Counsel undoubtedly has the ability to sift through voluminous discovery.