UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MADDIE RHEA ANGUIANO,<br><br>Defendant. | No. 5:25-CR-175-H-02 |

## MEMORANDUM ORDER AND OPINION

Before the Court is Maddie Anguiano's Motion to Suppress (Dkt. No. 54). Anguiano moves to suppress statements she provided during an interview with law enforcement investigators, an exchange which she contends was a custodial interrogation in violation of the Fifth Amendment. Dkt. No. 54. After reviewing the pleadings and applicable law, hearing the investigators' testimony, and considering the arguments of counsel, the Court denies the Motion.

## I. Factual and Procedural Background

In the summer of 2019, Airman First Class Marcus Anguiano (Marcus) became the subject of an Air Force investigation into allegations concerning his sexual abuse of a minor. Tr. 38:12–18; 82:17–25. As a part of that investigation, the Air Force Office of Special Investigations (AFOSI) obtained a search warrant on Marcus's cell phone, and on August 13, Investigator Nicholas Esposito and Special Agent Brandon Chandler collected that device during an interview with Marcus in the AFOSI detachment on Mountain Home Air Force Base in Idaho. Tr. 84:11–15; 85:7–17. When Marcus's interview began, the investigators read Marcus his rights under military law. Tr. 67:4–12; 84:20-22. Although he ultimately requested a lawyer and the interview ceased, Marcus initially provided a number

of statements. Tr. 84:16–85:1. Among them was his indication that he and his wife, Anguiano, watch pornography together. Tr. 84:18–19.

In addition to Marcus, the investigators also asked Anguiano to come on base for an interview. Tr. 86:19–87:4. As is typical in cases of this kind, investigators were interested in Anguiano's knowledge, as the subject's spouse, of Marcus's "sexual proclivities" since the couple "live[d] together in close proximity," Tr. 87:5–14, and because they watched pornography together—which was not "uncommon . . . among couples." Tr. 86:19–22. The investigators "thought that she may have [had] information about what Marcus was doing" and information about "what he may or may not have [had] on [his] phone." Tr. 39:5–10. Indeed, the investigators wanted to ask Anguiano if she knew Marcus's phone passcode. Tr. 87:5–9. Anguiano's interview directly followed Marcus's. Tr. 87:14–15.

As a "witness to a subject of investigation," Tr. 87:1, Anguiano's interview was considered "noncustodial." Tr. 39:19–40:4. And, at least in August 2019, this style of interview was distinct from a subject interview in various ways. For one, subject interviews were audio and video recorded, while witness interviews were not. Tr. 41:4–16; 65:5–12; 85:2–6. For another, witnesses were informed where the AFOSI detachment was, and they would transport themselves to the interview. Tr. 42:14–18. But unlike witnesses, subjects were "usually" picked up and driven to the detachment by the investigators. Tr. 42:18–20.

Furthermore, witnesses were "typically" informed that they were "not in trouble." Tr. 90:4–10. AFOSI investigators would also advise witnesses that they could "provide a . . . written statement at the end of the interview" but were "not required to." Tr. 90:11–14. Witness interviews were "very laid back," and civilian witnesses did not "have to answer any questions." Tr. 39:20–25. It was AFOSI policy that a witness was informed of two

things during the process: (1) her interview was noncustodial in nature, and (2) she could leave her interview at any time. Tr. 68:3–69:17.

On August 13, 2019, Anguiano arrived at the AFOSI detachment without the aid of investigators. *See* Tr. 88:22–25; 130:13–16. Although she lived outside of Mountain Home AFB, as an Air Force spouse, Anguiano would have been credentialed to access the military installation without supervision. Tr. 42:25–43:5; 60:3–14; 88:18–22. However, once at the detachment, Anguiano would have been escorted to a room designated for interviews because of confidential information within the building. Tr. 43:9–16; 60:22–24; 61:8–10; 62:6–17. The door to the room was closed but unlocked. Tr. 47:6–11.

When the interview began, the investigators did not read Anguiano her *Miranda* rights, nor did they do so at any point. *See* Tr. 63:10–11; 95:19–97:7. The interview lasted an indeterminate length of time. Tr. 51:14–15; 101:23–25. However, the investigators recalled it was "shorter" in nature and likely "pretty quick." Tr. 51:14–23; 97:24–98:10. During that period—however long it was—Anguiano provided the statements she now moves to suppress. *See* Dkt. No. 54. These include her confirmation that she and Marcus watched pornography together, Tr. 107:14–17, her acknowledgment that she knew Marcus "liked younger porn," Tr. 107:22–23, and her description of the pornography they both watched as "Hentai" depicting "lollies"—which are animations of people she described "as young as thirteen years old." Tr. 107:24–108:10.

At some point, the investigators asked Anguiano if she knew the passcode to Marcus's phone. Tr. 98:13–15. She indicated that she did know it but declined to provide it. Tr. 98:13–17. Then, at a subsequent point, Anguiano left the interview. Tr. 49:7–11; 58:9–15; 101:23–25. That choice was her own. Tr. 47:7–11; 58:9–15; 58:16–22; 99:6–12.

In the Report of Investigation (ROI) generated after Anguiano's interview, Anguiano was labeled a "subject" and not a witness. GX 1 at 2. However, this label was added some time after her interview once further investigation revealed facts that altered Anguiano's status. *See* Tr. 57:20–58:6; 70:18–71:9. It was only later, when forensic examiners reviewed Marcus's phone, that investigators began to suspect Anguiano of criminal conduct. *See* Tr. 57:20–25.

In December 2025, a grand jury in the Northern District of Texas indicted Marcus and Anguiano in a four-count indictment. Dkt. No. 3. Anguiano was charged with three of those counts: (1) Conspiracy to Produce and Attempt to Produce Child Pornography in violation of 18 U.S.C. § 2251(e); (2) Production and Attempted Production of Child Pornography in violation of 18 U.S.C. § 2251(a); and (3) Receipt and Distribution of Child Pornography in violation of 18 U.S.C. §§ 2252A(a)(2) and (b). *Id.* Anguiano pled not guilty to the counts against her on December 17, 2025. Dkt. No. 27.

On August 6, 2026, Anguiano filed the present motion. Dkt. No. 54. The government responded, Dkt. No. 60, and the Court held an evidentiary hearing. Dkt. No. 75. Anguiano filed a post-hearing memorandum. Dkt. No. 78-1. The motion is ripe for review.

## II. Legal Standard

"Generally, a suspect's incriminating statements during a custodial interrogation are inadmissible if [s]he has not first received *Miranda* warnings." *United States v. Nelson*, 990 F.3d 947, 955 (5th Cir. 2021); *see also Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "Whether a suspect is 'in custody' is an objective inquiry." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011). For *Miranda* purposes, a suspect is in custody "when placed under

formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Wright*, 777 F.3d 769, 774 (5th Cir. 2015).

"Two discrete inquiries are essential to that determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt . . . she was at liberty to terminate the interrogation and leave." *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012). The Court's analysis must encompass "all of the circumstances surrounding the interrogation." *Stansbury v. California*, 511 U.S. 318, 322 (1994). This includes "any circumstance that 'would have affected how a reasonable person' in the suspect's position 'would perceive . . . her freedom to leave.'" *J.D.B.*, 564 U.S. at 271 (quoting *Stansbury*, 511 U.S. at 325).

Critically, however, the "subjective views harbored by either the interrogating officers or the person being questioned are irrelevant." *Id.* (citation modified). Instead, courts "view the situation" through the vantage of a reasonable person. *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988). That reasonable person "must be neutral to the environment and to the purposes of the investigation—that is, neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances." *Id.*

Although "no one fact is determinative," the Fifth Circuit has identified "certain key details when analyzing whether an individual was or was not in custody." *Wright*, 777 F.3d at 775. These include (1) the length of the questioning, (2) the location of the questioning, (3) the accusatory, or non-accusatory, nature of the questioning, (4) the amount of restraint

on the individual's physical movement, and (5) statements made by officers regarding the individual's freedom to move or leave. *Id.* (collecting cases).

Finally, after analyzing whether the defendant had "freedom-of-movement," the Court must assesses "whether the environment surrounding the questioning implicated the concerns identified in *Miranda*." *United States v. Coulter*, 41 F.4th 451, 457 (5th Cir. 2022). In *Miranda*, the Supreme Court observed a "compulsion inherent in custodial surroundings." *Miranda*, 384 U.S. at 457–58. Accordingly, "[f]idelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984). "[S]tationhouse interrogation," as it is usually described, is a form of interrogation that is "frequently . . . prolonged," where "the detainee often is aware that questioning will continue until [s]he provides [her] interrogators the answers they seek." *Id.* at 438.

In moving to suppress statements, it is the movant's burden to demonstrate that the statement or statements targeted by her motion were made during a custodial interrogation. *United States v. Webb*, 755 F.2d 382, 390 (5th Cir. 1985); *United States v. Rahim*, 382 F. Supp. 3d 561, 567 (N.D. Tex. 2019) (citing *Webb*, 755 F.2d at 390). Only then must the government show "as a prerequisite to the statement's admissibility as evidence . . . that the defendant voluntarily, knowingly, and intelligently waived [her] rights." *J.D.B.*, 564 U.S. at 269–70 (citation modified) (citing *Miranda*, 384 U.S. at 444, 475–76). Generally, this also involves demonstrating that an "officer elicit[ed] statements from a suspect" after providing the *Miranda* warnings. *See United States v. Schexnayder*, 538 F. Supp. 3d 696, 705 (N.D. Tex. 2021). But "a mere failure to give *Miranda* warnings does not, by itself, violate a suspect's

constitutional rights or even the *Miranda* rule." *United States v. Patane*, 542 U.S. 630, 641 (2004).

## III. Analysis

Because Esposito and Chandler never *Mirandized* her, Anguiano's suppression argument hinges entirely on the custodial nature of her interview, which she bears the burden of demonstrating. Dkt. No. 78-1 at 12–13 (citing *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984), *overruled on other grounds by Bengivenga*, 845 F.2d 593). Having considered Anguiano's motion, the government's response, Anguiano's post-hearing memorandum, the testimony of Esposito and Chandler, and the totality of the circumstances, the Court concludes that Anguiano's interview was non-custodial in nature. Accordingly, Anguiano has not carried her burden to suppress the statements made during the interview.

The Court first considers Anguiano's freedom of movement and applies the *Wright* factors. Start with the length of the interview. Although the precise duration is lost to both memory and time (as a witness, Anguiano's interview was not recorded, Tr. 41:12–16), both Esposito and Chandler testified that the interview was relatively short in nature. Tr. 51:14–23; 98:4–10. This description is corroborated by a notable disparity in the quantity of notes taken during Anguiano's interview and those taken during Marcus's two-hour interview—the latter group consisting of "quite a few more." Tr. 98:4–10; *see also* Tr. 51:14–23 ("Yeah, with the amount that I wrote, which is hardly anything, really . . . it would be a short interview. Usually . . . if it's longer interviews, we tried to get as much detail as possible, so it would be multiple pages. So it's fair to that it was a shorter interview based on how many notes I took.").

Although the Fifth Circuit has "reject[ed] the broad proposition that a short [interview] constitutes *per se* a noncustodial interrogation or that an hour-long [interview] constitutes a *per se* custodial interrogation," *United States v. Harrell*, 894 F.2d 120, 124 n.1 (5th Cir. 1990), it has concluded before that a forty-minute interview was a neutral factor in the analysis, *United States v. Gonzalez*, 814 F. App'x 838, 844 (5th Cir. 2020), while a thirty-minute interview weighed in favor of non-custody. *United States v. Ortiz*, 781 F.3d 221, 233 (5th Cir. 2015).[1]

While the particular length of Anguiano's interview is unknown, Esposito's and Chandler's testimonies were consistent that it was "pretty" short. *See, e.g.*, Tr. 51:14–23; Tr. 98:9–10. Combined with Esposito's characterization of his notes ("hardly anything, really," Tr. 51:18–19), and the limited information the interview seems to have generated, *see* GX 2 at 1; GX 1 at 2, the evidence suggests that Anguiano's interview was almost certainly under an hour—if not under thirty minutes. In any event, it was limited in duration. The relative brevity of Anguiano's interview, while not individually dispositive, weighs against custody. *See Wright*, 777 F.3d at 775; *see also United States v. Arellano-Banuelos*, 927 F.3d 355, 361 (5th Cir. 2019) (explaining that "ten to fifteen minutes" weighed against custody); *United States v. Siegert*, 6:21-CR-96(1), 2023 WL 4384514, at *8 (W.D. Tex. Feb. 28, 2023) (noting that ten minutes weighed against custody), *rep. & rec. adopted*, 2023 WL 4235545 (W.D. Tex. June 28, 2023), *aff'd*, No. 23-50907, 2025 WL 88842 (5th Cir. Jan. 14, 2025).

Anguiano takes a different view. In her opinion, the interview's length "does not favor either side" because "[n]either agent could say how long the interview lasted." Dkt.

[1] In *Ortiz*, the court used the thirty-minute length to "further" differentiate Ortiz's case from the those of the appellants in *Wright*, 777 F.3d 769, and *Cavazos*, 668 F.3d 190, whose interrogations were deemed custodial. 781 F.3d at 233. The Fifth Circuit did not establish a per se rule.

No. 78-1 at 15. To be clear, the Court disagrees with her assessment of neutrality. Nonetheless, even setting the length factor aside, the remaining *Wright* factors all point toward non-custody. For one matter, Anguiano was never once restrained. *See* Tr. 48:23–49:11; 58:9–22; 99:6–12. As a civilian witness, she was not handcuffed or otherwise prevented from leaving the interview room of her own accord, and the door remained unlocked. Tr. 47:10–11; 48:23–49:11; 58:16–22 ("[W]hen you have someone, especially a witness, especially a civilian, that wants to leave, they are free to leave. There's nothing you can do."); 100:24–101:3. For another matter, neither Esposito nor Chandler adopted an accusatory tone or line of questioning with Anguiano because, as each investigator testified, they did not suspect her of any crime.[2] Tr. 52:4–12; *see* Tr. 52:13–53:19; 57:20–58:6; 95:11–97:23; 108:11–14.

[2] Anguiano contests this conclusion. She argues that because Anguiano "told the agents that she watched . . . 'lollie' pornography with [Marcus], and that the depictions were approximately thirteen to fifteen years old," Esposito and Chandler must have asked her about her own conduct. Dkt. No. 78-1 at 8–9. But a question about one's own conduct does not mean that question is inherently accusatory. Perhaps realizing this, Anguiano makes a further inference: Chandler might have suspected criminality on her part because of the age of the individuals depicted in the animated pornography she watched, *see id.* at 9–10; Tr. 108:1–110:18, and/or because "[t]he agents were already treating animated depictions of young figures as part of [their] investigation" of Marcus." Dkt. No. 78-1 at 11. As Anguiano's argument goes, this presumed suspicion "necessarily" changed the "character of the questioning." Dkt. No. 54 at 4, Dkt. No. 78-1 at 14. But this theory assumes too much. First, there is no evidence that Chandler actually suspected Anguiano of a crime. As Chandler testified, "there[] [were] a lot of differentiations to interpreting [Anguiano's] statement at that point in time," including that Marcus "could have pulled [lollie pornography] up on [Anguiano's] phone . . . [and] she could have just viewed it, not knowing what she was looking at." Tr. 109:8–14. Further, asking Anguiano about the couple's joint consumption of pornography is not strictly cognizable as an attempt to uncover her own criminal conduct. Instead, it is consistent with the investigators' motivation of "having her come in . . . to gauge [Marcus'] kind of sexual proclivities." Tr. 87:5–6. Moreover, animated child pornography is, penally speaking, distinct from actual child pornography. *See generally Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002). And even if Chandler (or Esposito) had his suspicions about Anguiano, there is no evidence that such a belief axiomatically generated an accusatory tone or line of questioning. In contrast, there is evidence that no accusations were levied here. As Esposito testified, at no point did the "dynamic" change to incorporate accusatory questions. *See* Tr. 52:4–12.

Next, consider the location. Anguiano's interview took place in a closed room within the AFOSI detachment on Mountain Home AFB. While these facts present a closer call, on balance, the interview location ultimately weighs against custody. Anguiano places great emphasis on the following fact: in order to access and exit the detachment, Anguiano required an investigator escort. *See* Dkt. No 78-1 at 15; *see also* Tr. 61:4–7 (Esposito testifying that no visitor "could just get into the building without us actually walking them to and from the building"); Tr. 62:6–15 (Esposito recalling that, once inside, "everybody" was escorted—whether to the "bathroom or whatever the case may be"); Tr. 129:14–24 (Chandler testifying that if someone wanted to leave, investigators "would give them their phone back" from a basket outside the interview room).[3] As Anguiano argues, "[l]eaving was not a matter of standing up and walking out; it meant asking an agent to take her out of a secured building." Dkt. No. 78-1 at 15.

First, however, Esposito's and Chandler's testimonies present different understandings about the freedom of movement that a reasonable person in Anguiano's position would have had inside the detachment. For example, Esposito recalled that, once inside, "everybody" was escorted everywhere—bathroom, exit, or otherwise. Tr. 62:6–15. Chandler, on the other hand, while corroborating that a visitor had to be escorted so long as she was simply "walking around the office" or "going to a place other than the bathroom or toward the door," did not testify that someone in Anguiano's place *required* an escort to use the restroom or depart the detachment. *See* Tr. 128:17–129:13.

[3] It was policy in the Mountain Home AFB AFOSI detachment for visitors to deposit their cell phones in a receptacle upon entry because of "sensitive information" stored in the office. Tr. 71:11–15. This policy was often explained to visitors. Tr. 71:16–72:1. According to Esposito, the need to safeguard intelligence was also why investigators had to escort visitors throughout the building. Tr. 62:11–17.

But even if an interviewee did require an escort everywhere inside the detachment, and even if she also required an investigator to retrieve her phone before she left (a fact that is also unclear in Anguiano's case, *see* Tr. 62:18–25), a number of other circumstances counsel against a finding of custody.

Importantly, the AFOSI detachment is not the only relevant setting in the Court's location analysis. As Anguiano notes, she was interviewed "on a military installation[] behind a guarded gate." Dkt. No. 78-1 at 15. But her contention that the wider environment of Mountain Home AFB would have restricted the movement of a person in her position is largely meritless. Air Force bases are undoubtedly secure environments—and Mountain Home AFB is no different—but contrary to most civilians, Anguiano had free access to that particular base as an Air Force spouse. Tr. 60:3–10; 126:14–17. All that was required for her to enter the installation was a military-spouse identification card. *Id.* And once on the base, Anguiano could leave it without further authorization. No guard station checked identification upon a guest's exit. Tr. 60:1–2. So, she would not have felt restricted in accessing or moving around the base, and she would not have been stopped on her way out. 89:1–7. Anguiano could have exited the base at any time.

Other detachment-specific facts counsel against weighing the location in favor of custody. For a start, Anguiano arrived and entered the detachment of her own volition, and she did so with full awareness that she would be "talk[ing] . . . about the situation with Marcus." Tr. 91:13–17; *see Gonzalez*, 814 F. App'x at 843 ("By asking—rather than forcing—Gonzalez to participate in the interview, the agents implied that he was free to terminate the questioning and leave . . . at any time."); *United States v. Brown*, 7 F.3d 1155,

1164 (5th Cir. 1993) (explaining that voluntary arrival at a police station weighed against custody).

Furthermore, at least at Mountain Home AFB's AFOSI detachment, a reasonable person in Anguiano's place would not have understood the need to be escorted inside that secure facility to be a restriction on her movement comparable to the kind associated with formal arrest. First, she came to a secure facility and chose to engage in the interview process there of her own accord. But beyond that, the circumstances within that facility simply did not reflect a restrictive environment. The interview took place in an unlocked room, Tr. 47:10–11, the investigators were dressed in non-intimidating plain clothes,[4] Tr. 44:12–25, and the investigators situated witnesses so that witnesses faced an unblocked view of the door at all times. *See* Tr. 47:1–48:13.

Also critically instructive is the investigators' habit of informing witness visitors that they could choose to stop their interviews at any time. Tr. 68:3–69:17. This fact informs the location analysis but is likewise central to the fifth *Wright* factor: statements made regarding the individual's freedom to move or leave. As to both factors, AFOSI investigators' policy to inform witnesses they were free to leave the detachment weighs squarely against concluding that Anguiano was in custody. Indeed, the non-custodial nature of an interview bookmarked by a verbal advisement that the interviewee is "not in trouble" and can "get up and leave at any time," Tr. 40:5–11; 68:3–69:17; 90:7–10, is clear.

[4] Chandler testified that he "typically" carried a firearm, but that it "would have likely been concealed." Tr. 92:9–19. He could not "recall many times where [he was] work[ing] at a detachment and [his] firearm [was] in a hostler on [his] hip." Tr. 92:20–22. He "typically carr[ied] concealed." Tr. 92:14.

However, in this case, neither Esposito nor Chandler could recall whether Anguiano was provided this assurance. Tr. 40:12–20; 90:7–19. But the Court finds that this lapse in memory is merely a function of time. *See, e.g.*, Tr. 40:14–20 ("[S]ince it's been . . . years, I couldn't tell you a hundred percent, right? But . . . that was a precedent set forward of we had to say that. But I can't tell you that I remember specifically saying it."). Because of the evidence that AFOSI investigators were required to give these or like advisements to witnesses, and that Esposito and Chandler would have done so habitually, the Court finds that they did on the occasion of Anguiano's interview as well. *See* Fed. R. Evid. 406; *see also* Tr. 40:25–41:3 (Esposito testifying to performing "hundreds, if not thousands" of witness interviews); 45:18–24 ("I mean, our policy was, if it's witnesses, specifically civilian witnesses, that we tell them—right off the top . . . . [T]hat was what we were taught to do. And that this is a noncustodial interview and that, at any point, they can leave, yeah."); 68:3–69:17 ("[E]very time we called in a witness, like, we had to say specific things."); 90:16–19 ("I don't see in the notes, but—I can't speak to exactly how Mrs. Anguiano's interview was that day, but that would be a, you know, typical pretty standard procedure for us.").

Nevertheless, Anguiano argues that the Court should not treat Esposito's and Chandler's testimonies as a "reliable guide" to what happened in the interview. Dkt. No. 78-1 at 13. As she sees it, the investigators are not credible because despite their testimony that it was the normal practice to begin recording witness interviews when the witnesses became subjects, *see, e.g.*, Tr. 52:13–53:14, the investigators did not do so here—undermining a conclusion that they acted in accordance with their habitual practices in Anguiano's case. Dkt. No. 78-1 at 13. But Anguiano misunderstands the record. Although

the post-interview ROI declares that Anguiano became a subject during the interview, *see* GX 1 at 2, the Court concludes, based on Esposito's and Chandler's testimonies, that this was not reflective of any determination those two investigators made during Anguiano's questioning. The Court reaches this conclusion for three reasons: (1) neither Esposito nor Chandler was responsible for labeling Anguiano a subject, *see* Tr. 55:6–56:19; 70:18–71:9; 103:24–104:12, (2) neither Esposito nor Chandler believed she was anything more than a witness at the time of her interview, *see* Tr. 57:20–25; 67:13–21; 103:24–25, and (3) in AFOSI investigations at the time of Anguiano's interview, ROIs were fluid, "running" documents that were revised post-hoc to reflect interviewee status changes—irrespective of how long after an interview the status changed. Tr. 56:5–19; 71:2–5; 102:6–25; 104:17–24. Anguiano's attempt to impeach Esposito's and Chandler's testimonies is unavailing, and the Court finds no reason to discredit their habit evidence. To the contrary, the Court finds their testimonies credible.

Therefore, because the Court finds that Esposito and Chandler apprised Anguiano of her ability to freely leave the interview—which is corroborated by the fact that she of course did, Tr. 49:7–11; 101:21–25—both the location of her interview and the investigators' statements about her ability to leave counsel against a finding of custody.[5]

Accordingly, in examining the totality of the circumstances, the Court concludes that a reasonable person in Anguiano's position would not "have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Bengivenga*, 845 F.2d at 596.

---

[5] In addition to their verbal advisements about Anguiano's ability to leave, neither Esposito nor Chandler testified to any non-verbal statements they made that sent Anguiano the opposite message. Tr. 46:24–47:23; 48:5–14; 100:1–13.

Finally, the Court must examine "whether the environment surrounding the questioning implicated the concerns identified in *Miranda*." *Coulter*, 41 F.4th at 457. But here, the Court has little difficulty concluding that it did not. In addition to the reasons explained at length, the greatest evidence that the pressures associated with stationhouse interrogation did not come to bear on Anguiano is that she flatly declined to accommodate certain investigator requests. Esposito and Chandler asked her if she would tell them the passcode to Marcus's phone and if she would compose a written statement. Tr. 98:13–23. She did neither. *Id.* As the Supreme Court explained in *Berkemer*, "[s]tationhouse interrogation . . . frequently may be prolonged," 468 U.S. at 438, and it is a form of questioning that "a reasonable person might expect . . . to continue 'until [s]he provides [her] interrogators the answers they seek." *Bengivenga*, 845 F.2d at 598 (quoting *Berkemer*, 468 U.S. at 438). Neither of those features is applicable here. Anguiano's interview at the AFOSI detachment was short, and before choosing to leave, she felt no pressure to provide Esposito and Chandler what they sought from her.

In sum, the Court finds that a reasonable person in Anguiano's position would have understood her freedom the same way Anguiano did—by declining to accommodate certain requests and ultimately leaving an interview the same way she entered it: of her own accord. Further, the Court finds that the AFOSI detachment did not present the pressures inherent to the stationhouse in *Miranda*. Because of these findings, the Court concludes that Anguiano was not in custody at the time she was interviewed by Esposito and Chandler. And because Anguiano has not carried her burden to demonstrate custodial interrogation, the statements she provided in that interview will not be suppressed.

## IV. CONCLUSION

Anguiano's Motion to Suppress (Dkt. No. 54) is denied.

So ordered on October 16, 2026.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE